Filed 2/3/15  P. v. Savary CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KEFFIER SAVARY,<br><br>    Defendant and Appellant. | B247512<br><br>(Los Angeles County<br>Super. Ct. Nos. KA083613,<br>KA094210) |

APPEAL from judgments of the Superior Court of Los Angeles County, George Genesta, Judge.  Affirmed.

Chris R. Redburn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 2008, defendant Keffier Savary killed Harrison Smith, who was having an affair with defendant's estranged wife. Defendant fled the state, but was apprehended on a murder warrant in Texas in 2011. While he was in custody for the 2008 murder, defendant attempted to dissuade his wife from testifying, and conspired with his girlfriend to have his wife and another witness killed. On August 9, 2011, the District Attorney filed two informations. The first charged defendant with the 2008 murder, and the second charged defendant with the 2011 crimes. Defendant never sought to consolidate the cases; rather, he agreed the two cases should be tried to separate juries, with the murder case to be tried first. Defendant was convicted of all charged crimes and enhancements in back-to-back trials before two separate juries.

In this consolidated appeal, defendant complains that the successive prosecutions violate Penal Code section 654 as interpreted in *Kellett v. Superior Court* (1966) 63 Cal.2d 822 (*Kellett*). Defendant also contends that insufficient evidence supports his conspiracy conviction. Defendant also contends the trial court erroneously failed to give a heat of passion instruction in his murder trial. Lastly, defendant contends that the trial court erred when it denied his request to replace his privately retained counsel for the second trial, or to allow him to represent himself.

We find no merit in any of these contentions and therefore affirm the judgments below.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The First Trial

We summarize below the testimony presented by each witness that is pertinent to defendant's claims on appeal.

In 2008, Linda Anderson lived with her son, Quinton Anderson, her daughter, and her two grandchildren. The murder victim, Harrison Smith, was a family friend, and visited the family's home almost daily. Ms. Anderson had known Mr. Smith for three years. Mr. Smith and her son, Mr. Anderson, were friends. Ms. Anderson testified Mr. Smith was not a violent or angry person; "he was nice and polite." She had never

2

seen him with a gun, and never saw him fight with anyone. Ms. Anderson also never saw him associating with gang members. Ms. Anderson knew Mr. Smith was dating defendant's estranged wife, Roselle Savary, who was in the process of divorcing her husband.

On June 21, 2008, Ms. Anderson hosted a birthday party for her grandson, attended by both children and adults. Mr. Smith was at the party. He was wearing fitted (not baggy) jeans, and he was not wearing a shirt, as it was a hot day. Ms. Anderson did not notice anything bulging from his pockets, and Mr. Smith was not wearing anything that could conceal a gun. Alcohol was not served at the party, and Ms. Anderson did not see Mr. Smith drink any alcohol. Mr. Smith was not acting drunk, or agitated, and seemed happy to participate in the party.

As it was getting dark, and after the children left the party, Mr. Smith invited Ms. Savary to come over to the Anderson home. Ms. Anderson was in her bedroom when she heard a "real loud pop sound." The "pop" sounded close, and when Ms. Anderson ran to the front of the house, she saw Ms. Savary running toward the house. Ms. Savary ran into the house and was hysterical, saying "I think my husband killed Harrison." Ms. Anderson immediately called 911, and put Ms. Savary on the phone to speak with the 911 operator.

When the police arrived, Ms. Anderson went outside and saw Mr. Smith laying flat on his back, with his eyes open, near the front door of the house. He was dressed the same as he had been earlier in the day.

Mr. Anderson testified that he and Mr. Smith had been close friends. Mr. Anderson testified that Mr. Smith had "Hitman" tattooed across his stomach and that he produced music under that name. But Mr. Anderson never saw Mr. Smith with a gun or associating with gang members. Mr. Anderson believed that Mr. Smith met Ms. Savary about three months before he was killed. Mr. Anderson had seen Ms. Savary with Mr. Smith four or five times. It appeared that Mr. Smith and Ms. Savary cared for each other.

3

Mr. Anderson did not initially know that Ms. Savary was married, but found out later, when he went to buy a television. A friend told Mr. Anderson someone was selling a television, and when Mr. Anderson went to the apartment to see it, Ms. Savary was there, as was defendant. Mr. Anderson bought the television from defendant, and saved defendant's phone number in his phone.

Sometime later, Mr. Anderson was interested in buying a keyboard from defendant. The two texted concerning the keyboard. Defendant asked Mr. Anderson if he could give defendant a gun in exchange for the keyboard defendant was selling. Defendant wanted either a nine- or .45-millimeter gun. Mr. Anderson did not respond to defendant's text message, and did not provide defendant with a gun.

Mr. Anderson testified that after the birthday party, he and Mr. Smith were standing in the driveway of the home. Mr. Anderson saw Ms. Savary walk up to the side of the house and gesture for Mr. Smith to walk over to her. As Mr. Smith walked toward her, Mr. Anderson went into the house. About a minute after Mr. Anderson went inside, he heard a single popping sound. Ms. Savary ran into the house. Mr. Smith then came to the front door, said "ah, dog" to Mr. Anderson as he reached for the door, and then fell back. Ms. Savary was hysterical. She was screaming, "I think my husband shot my baby."

Mr. Anderson went by the nickname "Sleep." His family started calling him that when he was only five or six years old.

The day after the shooting, defendant texted Mr. Anderson, asking whether Mr. Anderson "mess[ed] with his wife too." Defendant also texted, "I'm not in Cali no more, but I got peoples. They gonna come for you." Mr. Anderson felt threatened. Defendant also claimed to be associated with the "Jamaican mafia." Defendant told Mr. Anderson to leave Ms. Savary alone, and not help her, because "I want her to suffer for what she did." Defendant wrote that Mr. Anderson did not have to "worry" as long as he did not help Ms. Savary.

James Malone testified that in June 2008, he went to Marcel Robinson's house, and met defendant there. Mr. Malone, Mr. Robinson, and defendant discussed that

4

someone was dating defendant's wife. Mr. Robinson told defendant that Ms. Savary was seeing Mr. Smith. Mr. Malone told defendant to "let it go" because everyone goes through relationship problems. Defendant was angry and would not let it go. Defendant said if he saw Mr. Smith, he would "take care of him."

Mr. Robinson testified that in 2008, he had known Mr. Smith for several months. Mr. Robinson had seen Mr. Smith and Ms. Savary together several times at Mr. Anderson's house. Mr. Robinson knew that defendant was married to Ms. Savary but he thought they were separated when he saw her with Mr. Smith.

Mr. Robinson testified that defendant went by the nickname, "Big Sav."

Mr. Robinson corroborated Mr. Malone's testimony that in late June 2008, defendant and Mr. Malone were at Mr. Robinson's apartment, and defendant asked Mr. Robinson if he knew "Alex," a nickname that Mr. Smith went by. Mr. Robinson initially denied that he knew Mr. Smith. Later during the conversation, Mr. Robinson admitted that he knew Mr. Smith. Defendant seemed upset. Mr. Robinson later warned Mr. Smith to "be careful" and to "watch [himself]."

Several days later, defendant called Mr. Robinson, and asked him if he knew what had happened. Mr. Robinson asked defendant what he was talking about; he had not heard about Mr. Smith being shot. Defendant said he had fired a warning shot, and that he "had to handle [his] business."

Medical Examiner Jeffrey Gutstadt performed the autopsy on Mr. Smith. Mr. Smith died from a single gunshot wound to his chest. The bullet was fired at a minimum of one and a half to two feet away from Mr. Smith. During cross-examination, Dr. Gunstadt testified that Mr. Smith had tattoos, including "Hitman," "H 74 L-A," "4 Criminals," "South South 213" and "Central." The toxicology report showed that Mr. Smith had cocaine and methamphetamine in his system at the time of his death. On redirect, Dr. Gundstadt testified that Mr. Smith also had alcohol in his system. No gunshot residue was detected on Mr. Smith's hands.

Melanie Gagan testified that she was a friend of defendant's wife. Ms. Savary married defendant in 2003. Ms. Gagan and her husband often socialized with defendant

and Ms. Savary. On June 21, 2008, Ms. Gagan was working as the manager of the Chow King fast food restaurant. Defendant came to the restaurant that afternoon. He seemed angry and was speaking loudly. Defendant said that he and Ms. Savary were getting a divorce, and that Ms. Savary had a boyfriend. Ms. Gagan was scared because defendant did not seem to be in his right mind. She excused herself, telling defendant she had to attend a meeting in the back of the restaurant. Thirty or 45 minutes later, one of her coworkers handed her a note. Ms. Gagan believed the note was from defendant. It said, "Guess what, me and Roselle is divorced. She actually cheated on me and gave me [a] disease. She is so disgusting. I'm cured now, though. The doctor gave me medication. Anyway, good seeing you. Have a nice day."

Jose A. Espino is a homicide detective with the Los Angeles Sheriff's Department, and was the investigating officer in this case. The sheriff's department had filed the case against defendant in 2008, and had obtained a warrant for his arrest. On January 28, 2011, Detective Espino received a call from the fugitive detail of the sheriff's department's Major Crimes Task Force, advising that defendant had been arrested in El Paso, Texas. Detective Espino and his partner flew to El Paso on January 30, 2011. Defendant had been arrested at a Greyhound bus station, and his bus ticket, boarding pass, itineraries, and claim checks for checked luggage were confiscated. All of these documents were in the name of "James Carter." Defendant was also in possession of five different pieces of identification in the name of "James Carter," such as school identification cards, insurance cards, and a truck operator certificate.

Defendant was extradited back to California on February 10, 2011, and was housed in the men's central jail. Inmate phone calls are recorded, and investigating officers are assigned a password to access the recordings. Detective Espino listened to every one of defendant's phone calls between February 10, 2011, and May 2011. Generally, in-person visits are not recorded, but an officer can request that they be recorded. Detective Espino requested that defendant's visits be monitored.

Norman Clark, the custodian of records of Sprint Nextel, testified that Sprint turned over call records, including text message records, to law enforcement. At

1:45 p.m. on the day of the murder, "Big Sav" exchanged several text messages with an unknown number soliciting a "heater" that was "not [too] loud, if possible." Detective Espino testified that a "heater" is a gun. In defendant's text messages to the unknown number, he was asking for either a nine-millimeter or .45-caliber pistol.

Tiemeyer McCain testified he is a music producer who started collaborating with defendant, who he knew as "Sav," in 2008. In 2011, defendant started bringing a woman named Marilyn Aguilar to Mr. McCain's studio. Mr. McCain thought Ms. Aguilar might be defendant's girlfriend. Mr. McCain never met defendant's wife, but defendant told him he was married.

Earlier in 2011, Mr. McCain received a letter from defendant, sent from a Texas jail. The letter instructed Mr. McCain to contact defendant's wife and ask her to tell Mr. McCain where he could find "Sleep" so that Mr. McCain could "take care of" him. Mr. McCain believed defendant meant he wanted Mr. McCain to kill "Sleep." The letter also instructed Mr. McCain to kill Ms. Savary, and to "get her phone." In the lengthy letter, defendant said Ms. Savary "will meet up with you and . . . let her bring you to where Sleep stay and show you who he is. [¶] . . . [¶] Anyway, get rid of him, and then get rid her and remember to dispose of her phone. With them two gone, there's no case, and I could just go back to being me. And we can really get this music cracking. I need this done ASAP. ASAP, man. . . . [S]o don't slack on me. Like this week, gotta get to them. . . . [¶] . . . [¶] . . . before they put them in protective custody and shit. I don't know if they doing that. Here is my ex-wife address." Defendant provided two addresses because he was not sure which one was correct.

Mr. McCain was angry after receiving the letter. He testified that he does not hurt people. However, Mr. McCain did not take any action on the letter. Instead, he gave the letter to Ms. Aguilar. On cross-examination, Mr. McCain testified that he had been arrested in this case, but the charges were dropped in exchange for his testimony. He never agreed to kill anyone, and never took any steps to do so. On redirect, Mr. McCain clarified that he was never charged with murder, but he was arrested for conspiracy to commit murder. He was released a few hours after his arrest. He was never charged with

7

conspiracy to commit murder, and he was never promised anything in exchange for his testimony in this case.

Iris Cruz, a forensic document examiner, testified that the handwriting in the letter written to Mr. McCain matched defendant's handwriting.

Detective Espino testified that the exemplars given to the document examiner were obtained through a search of Ms. Aguilar's house. Detective Espino became aware of Ms. Aguilar when he started monitoring defendant's phone calls from jail. It was obvious from the calls that defendant and Ms. Aguilar were in a romantic relationship. At some point, Ms. Aguilar showed up at Detective Espino's office to recover some of defendant's property, and the detective recognized her voice from the calls. He also confirmed her identity from jail visitation records.

Detective Espino arrested Mr. McCain for conspiracy to commit murder on July 5, 2011. He was a suspect in the conspiracy to kill Ms. Savary and Mr. Anderson, also known as Sleep. After Mr. McCain was investigated further, it was determined that he took no action on defendant's letter to him, so no charges were ever filed. The sheriff's department did not bargain with Mr. McCain to obtain his testimony.

Ms. Aguilar was also arrested for conspiracy to commit murder, and was in custody at the time of defendant's first trial. She had not entered a plea and was not promised anything to cooperate with the investigation. Detective Espino executed a search warrant at Ms. Aguilar's home, and found a handwritten note among her possessions. The note provided Ms. Savary's home address and phone number, and stated that Ms. Savary gets home from work at about 7:00 p.m. The note stated that "Sleep" deals crack and "weed" and that there's "lots of traffic, so take backup." The note also stated, "Handle and will pay when out. Owe big." The note said to keep Ms. Savary alive.

Ms. Aguilar told Detective Espino that she wrote the note when she visited defendant. Defendant had instructed her to write the note, but had not done so orally because he knew the visits were recorded. Instead, he pressed notes up to the glass, and Ms. Aguilar copied the notes. The note was to be given to Mr. McCain, and was an

8

update to the previous instructions defendant had relayed to Mr. McCain. Ms. Aguilar visited Mr. McCain, and gave him the updated instructions to not harm Ms. Savary, and to kill Mr. Anderson. Ms. Aguilar told Detective Espino that she believed she was saving Ms. Savary's life by transmitting the note. However, she also understood that defendant was instructing her to write and pass a note to Mr. McCain directing him to kill Mr. Anderson.

Approximately seven hours of recorded jailhouse conversations were played for the jury. There were numerous calls and visits between defendant and his wife, and between defendant and his girlfriend. In his conversations with Ms. Savary, defendant tried to convince her to retract her statements to police. In a call with Ms. Aguilar, defendant described how he could send sealed letters from jail in Texas, but could not do so in California. He had tried to write Mr. McCain a letter with some "instructions" in Texas, but did not have his address. Defendant was reluctant to discuss the nature of the instructions with Ms. Aguilar, as their call was being recorded.

In another call, defendant asked Ms. Aguilar what she was allowed to bring when she visited him in jail. He asked if she could bring a pen and paper. She responded that she could bring "nothing," but that she could conceal a pen and some paper in her jacket, and she could perhaps write notes on her hand. Defendant also described how his first instructions "said two" and the second instructions, given to Ms. Aguilar to pass along to Mr. McCain, "said only one" referring to the witnesses that defendant wanted "gone." In their conversations, defendant and Ms. Aguilar went to great lengths to speak discretely, in code, aware that their calls were being recorded. Defendant never discussed self-defense, or that Mr. Smith had been armed. He did discuss with Ms. Aguilar the possibility of other defenses, such as posttraumatic stress or insanity.

Defense expert, toxicologist Marvin Pietruzka, had reviewed the coroner's report. The coroner's toxicology report indicated that Mr. Smith had alcohol, cocaine, and methamphetamine in his system at the time he died. Someone under the influence of cocaine or methamphetamine may behave erratically, and their judgment would be diminished. They also could believe "they can conquer the world" and act aggressively.

The combination of drugs and alcohol in Mr. Smith's system would have impaired his judgment, and made him "more confident than he should be." The drugs could also cause tremors, jerking, and rapid hand movement.

Defendant testified. He was born in Jamaica, and came to the United States when he was five years old with his parents, who are ordained ministers and pastors of a church. Growing up, he learned how to play several instruments in the church band. He also received scholastic art awards while in high school, and graduated from high school with a 4.0 grade point average. He received a scholarship to attend art school in Pasadena, California. He met Ms. Savary in college. Defendant lost focus in school because he had fallen in love with Ms. Savary, and stopped attending. He decided to join the air force.

Defendant attended basic training in San Antonio, Texas. He learned hand-to-hand combat and received weapons training for various types of firearms. He also attended trade school while in the military. Eventually, defendant received his orders to be stationed in Fairbanks, Alaska. He married Ms. Savary and they lived together in a house on the base there. Ms. Savary eventually left Alaska to attend her sister's wedding in California. She stayed in California, and did not return to Alaska. Defendant was honorably discharged from his service, and moved back to California to live with Ms. Savary at her parents' house.

When defendant reunited with Ms. Savary, things were not the same. Ms. Savary stopped attending Church, and started sneaking out late at night, wearing provocative clothing. She acted like she did not care about defendant. When Ms. Savary would come home late, she would shower, and would not be intimate with defendant. She also would smell like marijuana. Defendant found marijuana, ecstasy pills, and white powdery substances in her possession. She never possessed drugs in Alaska. Ms. Savary was also secretive about her phone.

Defendant started to "snoop around" and investigate his wife. He would look in her purse and her wallet, and would follow her to find out where she was going. Defendant determined that she was seeing someone behind his back. He saw her with the

10

same man at various restaurants, at a motel, and at "Sleep's" house. He saw them kissing. Defendant discovered the man went by "Alex," "Harrison," and "Hitman." Defendant also found out that the man had AIDS, and that he had given it to a former girlfriend. Moreover, he was bisexual and had sex with men, and was a member of a gang. Defendant was scared when he discovered that Mr. Smith was a gang member.

Defendant confronted Ms. Savary about the affair, but she denied it. Defendant then started to sleep in his car, and was "pretty much done" with the relationship. While sleeping in his car, he noticed various vehicles approach his car, and saw people looking inside his car. He was scared, and concerned he might be robbed, so he started asking around for a gun to protect himself.

Eventually, Ms. Savary tried to reconcile with defendant, and admitted to having an affair and having unprotected sex. Defendant warned Ms. Savary that Mr. Smith had AIDS, but she did not believe him.

Ms. Savary and defendant got back together after Ms. Savary promised to end her relationship with Mr. Smith. She gave defendant the code for her phone so he could access her phone records. Her drug use also appeared to slow down. However, when defendant checked her phone, he discovered that she and Mr. Smith were still texting each other.

When defendant drove by the house of his friend Marcel Robinson, he saw Ms. Savary and Mr. Smith there. The next day defendant confronted Mr. Robinson, asking him if he knew Mr. Smith. Mr. Robinson initially denied knowing Mr. Smith, or that Ms. Savary was cheating with him, but eventually admitted that he knew Mr. Smith.

Defendant confronted Ms. Savary, and she said the relationship with Mr. Smith was over, but defendant did not believe her.

Defendant spent the morning of June 21, 2008, with Ms. Savary. While they were sitting in his car, Mr. Smith called Ms. Savary. Defendant told her to answer the call and put it on speakerphone. During the call, Mr. Smith told Ms. Savary that he missed her and wanted to see her. She told Mr. Smith that she wanted to reconcile with defendant and end her relationship with Mr. Smith. Mr. Smith got mad and threatened to kill

11

defendant. He then told Ms. Savary there was a party at "Sleep's" house and he would talk to her there.

Ms. Savary assured defendant the relationship with Mr. Smith was over, but he did not believe her. Defendant became angry and broke Ms. Savary's phone. Ms. Savary promised to break up with Mr. Smith in front of defendant at the party. Defendant agreed to the plan, and dropped off Ms. Savary at home.

Defendant reflected on Mr. Smith's statement that he was going to kill defendant, and became frightened. Defendant "felt like . . . a walking dead man. . . . I mean, . . . this notorious gangbanger. He got AIDS . . . he's already dying, probably doesn't care about nothing, and he said he's going to kill me." Defendant believed the threat and started asking around for a gun, and was able to get one. The text messages sent referring to a "heater" were his, looking for a gun. Defendant would not say where he got the gun, but he got it that day.

Later that day, defendant picked up Ms. Savary from her house, and drove her to the party. He dropped her off in front of Mr. Anderson's house and looked for a place to park. After parking, he placed the gun in his front right pant's pocket. It was a 0.38 special revolver, and it was fully loaded. Ms. Savary motioned to defendant to come over, and as he approached, Ms. Savary ran and hid behind Mr. Smith. Mr. Smith was wearing baggy pants and no shirt. Defendant saw a tattoo on Mr. Smith that said "Hitman." Mr. Smith started to walk toward defendant with his hand in his back pocket. Defendant was scared because he thought Mr. Smith might have a gun or a knife in his pocket.

Mr. Smith seemed to be high; his eyes were red, and his hands were fidgeting. Defendant tried to convey that he was "there in peace" and extended his hand for a handshake. Mr. Smith did not shake defendant's hand and said, "F--- you, cuz." Defendant became more scared and put his hand in his pocket, with his finger on the trigger of the gun. He told Mr. Smith he did not want any problems, and that he just wanted Mr. Smith to leave his wife alone. Defendant implored Mr. Smith to "At least . . . tell her about the AIDS you have." Mr. Smith seemed to get angry, and he put his hand

12

in his back pocket again. Mr. Smith and defendant exchanged insults, and then Mr. Smith reached into his back pocket and pulled out a gun. Defendant was able to pull out his gun first, and to get off a single shot. He "shot one time in self-defense."

Mr. Smith fell to the ground. The gun fell out of his hand, and Mr. Smith reached for the gun. "[A]t that time, [defendant's] military instincts kicked in" and he grabbed Mr. Smith's gun and fled the scene so that Mr. Smith could not shoot him. Defendant did not mean to kill Mr. Smith. He never planned on killing Mr. Smith. He brought the gun to the party to protect himself in case Mr. Smith tried to kill him.

Defendant got in his car, drove on the 210 East, and exited the freeway in Ontario. He went to a McDonald's to dispose of the guns. He ordered a meal so he could get a McDonald's bag, took all the bullets out of the guns, and wiped his fingerprints off the bullets and the guns. He placed the guns in the McDonald's bag and threw it in the garbage at the restaurant. Mr. Smith's gun was a 0.22 Beretta.

Defendant then drove to Mr. McCain's mother's house in Duarte. Defendant told Mr. McCain that his wife's boyfriend had tried to kill him, and that defendant shot him in the arm in self-defense. Mr. McCain told defendant that if the gun he used was not registered to him, he could not claim self-defense. Defendant believed Mr. McCain because defendant was not from California, and Mr. McCain had been in and out of jail. Defendant stayed at Mr. McCain's mother's house that night. At that point, he did not know whether Mr. Smith was dead or alive.

After learning about Mr. Smith's death, defendant was scared about gang retaliation. Defendant also learned he was a person of interest in Mr. Smith's murder when Mr. McCain showed defendant a newspaper article about the shooting.

Defendant decided to leave town, concerned that gang members would come after him. Defendant gave his car to a friend to sell, and got on a Greyhound bus to Miami. Defendant used the alias James Carter. He stayed in Miami for about a week, and then got on a bus heading toward California. He stayed in Tucson, Arizona, for about a month. After that, defendant returned to California. Defendant evaded arrest for three years, and spent most of that time in California.

13

Defendant had met Ms. Aguilar before the shooting. He contacted her after he returned to California because he needed financial help. Defendant did not tell Ms. Aguilar about the shooting. Eventually, their relationship became intimate.

For Christmas of 2010, Ms. Aguilar bought defendant a bus ticket so he could visit his family in Miami. On his way back to California, during a stop in Texas, defendant got off the bus to purchase a beer at a liquor store. He was drinking it outside when he was approached by police. Defendant gave them his real license, instead of his "James Carter" identification, and the police found an active California warrant and arrested him. Defendant was taken to jail in El Paso. One of the inmates in jail told defendant that he would face the death penalty, and that he should contact any witnesses and ask them not to testify.

Defendant admitted writing the letter to Mr. McCain but denied that he intended for anyone to be killed. After his extradition back to California, defendant made a series of phone calls and had a number of visits. Never did he instruct anyone to kill anyone. Defendant never told anyone he acted in self-defense because he did not believe he had a self-defense claim based on what Mr. McCain had told him. Defendant admitted saying he wanted his wife to suffer, because he believed she had set him up to be killed.

During cross-examination, defendant testified he did not want a loud gun because the loud guns he used in the military hurt his ears. When he asked Mr. Anderson for a gun, it had nothing to do with Mr. Smith; it was because he was scared he was going to be robbed while he was sleeping in his car. He did not go to police after the shooting because he was scared of police.

Mr. McCain was called as a rebuttal witness, and denied ever discussing the shooting in June 2008 with defendant. He also denied telling defendant that self-defense was not available to him under California law (a fact to which he had also testified when called in the prosecution's case-in-chief). Mr. McCain did not know about defendant's involvement in the shooting until he received defendant's letter in 2011.

The first trial concluded on July, 5, 2012, with the jury finding defendant guilty.

14

## II.    The Second Trial

The second trial began on July 10, 2012, and was considerably shorter than the first trial, but included some of the same evidence that was presented in the first trial. Mr. Anderson and Mr. McCain provided largely identical testimony to the testimony they provided in the first trial. Iris Cruz testified again as a handwriting expert. Detective Espino testified about defendant's apprehension, and defendant's conduct after his arrest, including the various recorded phone calls and visits that were made in jail.

Some of those recordings (considerably fewer than in the first trial) were played for the jury. The recording where defendant and Ms. Aguilar discussed the possibility of her smuggling a pen and paper into jail was included in the selection played for the jury.

Detective Espino testified there were many silent pauses in the recorded conversations between defendant and Ms. Aguilar. In his experience working in a custodial environment, inmates and their visitors will often communicate nonverbally because they know they are being recorded, by writing notes and holding them up to the glass.

Detective Espino testified that Ms. Aguilar had pled guilty to dissuading a witness in exchange for her testimony against defendant in the second trial. Ms. Savary and Ms. Aguilar testified for the first time in the second trial.

Ms. Savary testified that she and defendant had married in 2002 and separated in 2008. After they separated, she started dating Mr. Smith. She was the only eyewitness to the shooting on June 21, 2008.

Defendant sent Ms. Savary a number of text messages in 2010, saying she "knew what would happen" if she cheated on him, and asking "So are you happy now? He died because of you, and his friends will die too in the future. Was all that worth it?" Ms. Savary asked defendant if he intended to kill her, and he responded that he was going to kill Sleep and "the rest of them."

In January 2011, Ms. Savary received a text message from defendant that he was in jail in El Paso. She also received a text message that said, "Don't testify."

When defendant was extradited to California, he called Ms. Savary from jail. Defendant told her about the poor conditions in jail, and she felt bad for speaking to police. Defendant asked her to change her statement to police, and to not go to court and testify.

Ms. Aguilar testified that in 2007, she was a counselor at a regional occupational program. She met defendant when he came to her place of employment seeking information about job courses. Defendant told her that he was not married, and in early 2010, the two started dating. In late 2010, defendant left California. At the time he left, they had been dating for about eight months.

In January 2011, Ms. Aguilar received a text message from defendant that he "[g]ot caught in a bar. I might go to jail." She later received a second text from defendant that he was in jail, and wanted her to find him a lawyer. He did not tell her why he was in jail. She learned what the charges were when she attended his first court appearance in California.

In phone conversations she had with defendant while he was in jail, she learned for the first time that he was married. She also learned that defendant's wife was a witness to the murder defendant was charged with. Ms. Aguilar also discovered that Mr. Anderson had information related to the murder, such as threatening text messages from defendant. Defendant conveyed that Mr. Anderson was a threat to him, and that his wife was the primary witness against him.

Ms. Aguilar was aware that their phone conversations and visits were recorded. Defendant instructed her to bring paper and a pencil so they could communicate nonverbally, and he could write notes for her to copy. When she visited, defendant would have prewritten notes he would hold up to the glass. She would copy the notes exactly as they were written. She also sometimes took notes of defendant's verbal instructions. Defendant instructed her to relay messages for him. She also helped defendant obtain counsel, stay in contact with friends and family, and was raising funds for his defense.

16

Defendant and Ms. Aguilar discussed plans to prevent Ms. Savary from testifying, or to have her change her testimony. Ms. Aguilar agreed to relay a message from defendant to Mr. McCain. When she visited Mr. McCain at his office, he showed her the letter defendant had written from jail in Texas. The letter instructed Mr. McCain to "eliminate" or "kill" Mr. Anderson and Ms. Savary to "make sure they weren't around for the trial."

Ms. Aguilar confirmed she wrote the note to Mr. McCain about keeping Ms. Savary alive and killing Mr. Anderson. She copied the note exactly as she was instructed. She understood the note to mean that there was a plan to kill both Mr. Anderson and Ms. Savary, but that defendant had a change of heart and wanted to keep Ms. Savary alive. However, she also understood that defendant still intended for Mr. Anderson to be killed. She gave the note to Mr. McCain "[t]o keep [Ms. Savary] alive" even though it meant that Mr. Anderson would be killed. She knew that if she delivered the instructions, Mr. Anderson might be killed.

Ms. Aguilar was arrested on May 5, 2011, and charged with dissuading a witness and conspiracy. In November 2011, she provided a recorded statement to police. No deal had been offered to her at the time, and she was truthful in her statement. The week before her testimony in this case, she pled no contest to dissuading a witness. She had not been sentenced yet, and had received no offer from the People. However, as a condition of her plea, she was required to testify truthfully in this case.

## DISCUSSION

## I.    Penal Code Section 654

Defendant contends his successive prosecutions violate the Penal Code section 654 proscription against multiple prosecution, as explained in *Kellett*, *supra*, 63 Cal.2d 822. He acknowledges that his attorney agreed to try the murder charge separately from the other charges and did not object on the basis of *Kellett*, but argues the claim is not forfeited on appeal because error under section 654 is not subject to forfeiture, and the failure to object constituted ineffective assistance of counsel. We find no merit in either contention.

17

Penal Code section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." Section 654 addresses both multiple *punishment* and multiple *prosecution*. (*People v. Correa* (2012) 54 Cal.4th 331, 336 (*Correa*).)

"The separate concerns have different purposes and different rules of prohibition." (*People v. Valli* (2010) 187 Cal.App.4th 786, 794 (*Valli*).) The "purpose of the protection against multiple punishment is to insure that the defendant's punishment will be commensurate with his criminal liability." (*Neal v. State of California* (1960) 55 Cal.2d 11, 20, disapproved on other grounds as stated in *Correa*, *supra*, 54 Cal.4th at p. 344.) The bar against multiple prosecution is a ' " 'procedural safeguard against harassment and is not necessarily related to the punishment to be imposed. . . .' [Citation.]' " (*Correa*, *supra*, at p. 336.)

An appellate court may address a sentencing error under the protection against multiple *punishment* at any time, even if no objection was made below. (*People v. Le* (2006) 136 Cal.App.4th 925, 931.) However, the same is not true for multiple *prosecution* error. Our Supreme Court has found the claim of multiple prosecution is forfeited when no objection was made in the trial court. (*People v. Jones* (1998) 17 Cal.4th 279, 313.) Sentencing errors are in excess of a court's jurisdiction, and may be corrected at any time. (*Le*, at p. 931.) Unlike sentencing error, the trial court should decide in the first instance a claim of multiple prosecution so as to avoid the waste of time inherent in allowing multiple trials to proceed when only one is required. (See, e.g., *People v. Saunders* (1993) 5 Cal.4th 580, 589-590.)

Here, defendant not only failed to object to having two trials, but he *agreed* to two trials, with the murder trial to proceed first. Predictably, defendant claims ineffective assistance of counsel. (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 467 [In order to demonstrate ineffective assistance of counsel, defendant must show that counsel's

18

performance fell below an objective standard of reasonableness, *and* that he was prejudiced by counsel's performance].)  Initially, we note that the record reveals a clear tactical basis for having two trials.  (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1215 ["Where the record shows that the omission or error resulted from an informed tactical choice within the range of reasonable competence, we have held that the conviction should be affirmed."].)  By agreeing to two trials, counsel effectively limited the introduction of potentially prejudicial evidence in either trial.

We also turn briefly to the merits of the *Kellett* claim, to show that any objection would have been baseless.  In *Kellett*, *supra*, 63 Cal.2d 822, our Supreme Court "construed section 654's multiple prosecutions bar to apply whenever 'the same act or course of conduct plays a significant part' in two or more offenses, assuming the prosecution in the first case was or should have been aware of all the offenses." (*People v. Homick* (2012) 55 Cal.4th 816, 841.)  The court explained that "[f]ailure to unite all such offenses will result in a bar to subsequent prosecution of any offense omitted if the initial proceedings culminate in either acquittal or conviction and sentence." (*Kellett*, *supra*, at p. 827.)  " 'The *Kellett* rule, while seeking to prevent harassment of defendants, [is] bottomed in large part on a concern for avoiding needless repetition of evidence, and for conserving the resources and time of both the state and the defendant.'  [Citations.]  Thus the offenses must be transactionally related, and not just joinable . . . . [Citation.]" (*People v. Turner* (1985) 171 Cal.App.3d 116, 129.)

Defendant contends the prosecution's failure to join the conspiracy and witness dissuasion charges with the murder charge violated the *Kellett* rule because the prosecution was aware of both sets of crimes and the offenses arose from the same course of conduct.  It is undisputed that the prosecution was aware of all of the crimes before either trial commenced.  We must therefore determine whether "the same act or course of conduct play[ed] a significant part" in both offenses. (*Kellett*, *supra*, 63 Cal.2d at p. 827.)

"Appellate courts have adopted two different tests to determine a course of conduct for purposes of multiple prosecution." (*Valli*, *supra*, 187 Cal.App.4th at p. 797.)

19

"One line of cases finds *Kellett* not applicable where the offenses are committed at separate times and locations." (*Ibid.*, citing *People v. Douglas* (1966) 246 Cal.App.2d 594; *People v. Ward* (1973) 30 Cal.App.3d 130; and *People v. Cuevas* (1996) 51 Cal.App.4th 620.)

Another line of cases has applied an evidentiary test that considers "the totality of the facts and whether separate proofs were required for the different offenses." (*Valli*, *supra*, 187 Cal.App.4th at p. 798, citing *People v. Flint* (1975) 51 Cal.App.3d 333; *People v. Hurtado* (1977) 67 Cal.App.3d 633 (*Hurtado*).) When applying the evidentiary test, courts evaluate whether proving the two offenses requires substantially distinct "evidentiary pictures" and "different witnesses," and whether the " 'evidence needed to prove one offense necessarily supplies proof of the other.' " (*Valli*, *supra*, at pp. 798-799; *Hurtado*, *supra*, at p. 636 [under the "evidentiary" test, two offenses "must be prosecuted together" "if the evidence needed to prove one offense necessarily supplies proof of the other"].) "[M]ore than a trivial overlap of the evidence" is required. (*Valli*, *supra*, at p. 799.) "Simply using facts from the first prosecution in the subsequent prosecution does not trigger application of *Kellett*." (*Ibid.*)

Defendant's claim fails under either test. First, the offenses occurred years apart, in different locations. The murder occurred in Rowland Heights in 2008, and defendant committed the later crimes from jails in El Paso and Los Angeles in 2011. Also, the offenses required different proof. Proof of the murder did not prove the conspiracy or dissuasion offenses. (See *Hurtado*, *supra*, 67 Cal.App.3d at p. 636.) Although there was some overlap of evidence presented in the two trials, in that Mr. Anderson and Mr. McCain testified similarly in both trials, the prosecution's decision to use evidence of the witness dissuasion and conspiracy in the murder (to establish a consciousness of guilt) and murder in the dissuasion and conspiracy trial (to establish motive) does not run afoul of the evidentiary test. (*Ibid.*) Therefore, the "needless repetition" with which *Kellett* was concerned did not occur here. (See *People v. Turner*, *supra*, 171 Cal.App.3d at p. 129.)

20

## II. Sufficiency of the Evidence

Defendant contends that insufficient evidence supports his conviction for conspiracy to commit murder. When reviewing the sufficiency of the evidence, "our role on appeal is a limited one." (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) Reversal is not warranted unless it appears that "'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) Here, substantial evidence supported the conviction.

A conspiracy is an agreement by two or more people to commit an offense with the specific intent to commit the elements of the offense, coupled with an overt act by one or more of the conspirators in furtherance of the conspiracy. (Pen. Code, §§ 182, subd. (a)(1), 184; *People v. Jurado* (2006) 38 Cal.4th 72, 120.) A conspiracy " 'may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design.' [Citation.]" (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1025.) Therefore, " 'a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135.)

The evidence established that Ms. Aguilar and defendant went to great lengths to conceal the content of their communications in the course of planning the murder of Mr. Anderson while defendant was in jail. Ms. Aguilar was aware that defendant had asked Mr. McCain to kill both Ms. Savary and Mr. Anderson, and brought a pencil and paper to jail to take down further instructions from defendant. Ms. Aguilar passed a note to Mr. McCain that ordered Mr. Anderson's death, knowing its content. This is powerful evidence from which the jury reasonably inferred that she and defendant had an agreement to commit murder.

## III. Heat of Passion Instruction

Defendant argues the trial court had a sua sponte obligation to instruct on the lesser included offense of voluntary manslaughter based on heat of passion, and wrongfully refused his request for such an instruction. We disagree.

21

Voluntary manslaughter, based on the theory of heat of passion, is a lesser included offense of murder. (*People v. Breverman* (1998) 19 Cal.4th 142, 153-154.) A trial court is required to instruct on a lesser included offense when the lesser offense is supported by evidence substantial enough to merit consideration by the jury. The trial court need not instruct, however, if there is no evidence that the offense committed was less than that charged. (*Id*. at pp. 154-155; see also *People v. Barton* (1995) 12 Cal.4th 186, 196, fn. 5.)

We find no error in the trial court's refusal to instruct on a heat of passion theory of attempted voluntary manslaughter. Heat of passion has both objective and subjective components. (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.) The defendant must subjectively act in the heat of passion. (*Ibid.*) And the claimed provocation must be sufficient to cause a reasonable person under the same circumstances to act rashly, without deliberation and reflection, from passion rather than from judgment. (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.) The provocation must be such that a "reasonable person in defendant's position would have reacted with homicidal rage." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1086.)

Here, there was absolutely no evidence that defendant killed Mr. Smith in a fit of rage. When his counsel asked whether he "snapped" when Mr. Smith insulted him, defendant simply responded that he was "upset." There was simply no evidence defendant was overcome by passion. To the contrary, defendant testified extensively to his preparations to defend himself from an anticipated attack by Mr. Smith. Accordingly, an instruction on this theory was not required.

## IV.    Issues Concerning Defendant's Representation

The jury in the murder case reached its guilty verdict on July 5, 2012. The conspiracy case had been set to trail the murder case. As the attorneys were discussing the setting of the second case for trial, defendant informed the court that he would like to "fire" his retained counsel, but that he had not found a new attorney to replace him. Defendant also informed the court that he intended to file a motion for a new trial. Defendant's retained counsel asked the court to appoint a public defender so that

22

defendant could file a new trial motion. The court indicated that it would address the matter on July 9, 2012.

On July 9, 2012, defendant clarified that he wanted to discharge his attorney in both the murder case, and in the conspiracy case. The court expressed its view that defendant's request was timely as to the murder case, which had been continued to August for sentencing, but was untimely as to the conspiracy case, as witnesses had been ordered back for trial, and the request to relieve counsel came the day before the case was set to proceed to trial. The court informed defendant that he could discharge retained counsel, as long as he was ready to immediately defend himself, or could find substitute counsel that was ready to start trial as scheduled. The People announced they were ready to proceed, and that witnesses had been ordered to appear for trial.

Defendant explained that he had not been "getting along" with his retained counsel. The court inquired if defendant was prepared to represent himself in a trial starting the following day. Defendant responded that he would "need some time." The court asked how much time defendant would need, and defendant said he would need a month. The court said that it would not continue the case for a month, as witnesses had been ordered back. The court found defendant's requests to discharge retained counsel, and to represent himself, to be untimely.

Defendant was appointed counsel to represent him during sentencing in the murder case. His original attorney continued to represent him in the conspiracy case. After the jury returned its verdict in the conspiracy case, defendant again moved to discharge retained counsel, and the court permitted him to substitute in his new attorney for sentencing.

" 'The right of a nonindigent criminal defendant to discharge his retained attorney, with or without cause, has long been recognized in this state [citations] . . . .' [Citation.] While a defendant may discharge appointed counsel only if that lawyer is rendering inadequate representation or there exists an irreconcilable conflict between counsel and client [citation], he or she may discharge retained counsel for any reason. [Citation.] The right to discharge retained counsel is not, however, absolute. The trial court may deny a

23

request to discharge retained counsel 'if discharge will result in "significant prejudice" to the defendant [citation], or if it is not timely, i.e., if it will result in "disruption of the orderly processes of justice" [citations].' [Citation.] '[T]he "fair opportunity" to secure counsel of choice provided by the Sixth Amendment "is necessarily [limited by] the countervailing state interest against which the sixth amendment right provides explicit protection: the interest in proceeding with prosecutions on an orderly and expeditious basis, taking into account the practical difficulties of 'assembling the witnesses, lawyers, and jurors at the same place at the same time.' " ' [Citation.]" (*People v. Keshishian* (2008) 162 Cal.App.4th 425, 428.)

Here, the trial court did not abuse its discretion in denying defendant's request. The trial court reasonably found the request untimely, having been made the day before the case was set for trial. (*People v. Keshishian*, *supra*, 162 Cal.App.4th at p. 429 [request to discharge retained counsel made on day set for trial properly ruled untimely]; see also *People v. Hernandez* (2006) 139 Cal.App.4th 101, 109 [request untimely when made right before commencement of jury selection]; *People v. Turner* (1992) 7 Cal.App.4th 913, 919 [same]; *People v. Lau* (1986) 177 Cal.App.3d 473, 479.)

Defendant contends his request was timely because he could not dismiss retained counsel during the first murder trial, and he requested to do so at his first opportunity. However, defendant was on notice (and agreed) that the conspiracy case would trail the murder case. Had he become dissatisfied with counsel's representation at any point before or during trial, he could have sought replacement counsel. However, it appears he only became dissatisfied with his representation after the jury returned its verdict. At that time, witnesses for the second trial had already been ordered to appear. Both the prosecution and retained counsel were ready to proceed with the second trial. The trial court reasonably concluded that weeks of additional delay amounted to an unacceptable disruption of the proceedings.

Defendant's request to represent himself was also untimely. A defendant has the constitutional right under the Sixth and Fourteenth Amendments to represent himself, and may waive the right to counsel. (*Faretta v. California* (1975) 422 U.S. 806, 819.) If the

24

defendant makes an unequivocal request of self-representation within a reasonable time of trial, and waives his right to counsel after having been advised by the court of its dangers, the request must be granted. (*Id*. at p. 835; see also *People v. Valdez* (2004) 32 Cal.4th 73, 97-98.) "In order to invoke the constitutionally mandated unconditional right of self-representation, a defendant must assert that right within a reasonable time prior to trial." (*People v. Horton* (1995) 11 Cal.4th 1068, 1110.) A motion not made within a reasonable time before trial is addressed to the sound discretion of the trial court. (*Valdez*, *supra*, at p. 102.) A motion made immediately before or on the day of trial is generally considered untimely. (See *People v. Howze* (2001) 85 Cal.App.4th 1380, 1397; *People v. Fitzpatrick* (1998) 66 Cal.App.4th 86, 91, 92.)

Again, defendant's request to represent himself was made the day before the case was scheduled to go to trial, and it was manifestly clear that defendant was not prepared to represent himself. As discussed above, the court's ruling was clearly within the scope of its discretion.

## DISPOSITION

The judgments are affirmed.


GRIMES, J.

We concur:

RUBIN, Acting P. J.



FLIER, J.

25